Filed 9/3/15  P.C. v. Super. Ct. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| P.C.,<br><br>　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>　　　Respondent;<br><br>ALAMEDA COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>　　　Real Parties in Interest. | A145275<br><br>(Alameda County<br>Super. Ct. No. OJ13021302) |

　　　Mother seeks writ relief directing the trial court to reverse its order terminating child reunification services, or alternatively, staying the trial court's permanency planning hearing.  We deny the writ, as substantial evidence shows return of the child would present a substantial risk of detriment.

### BACKGROUND

　　　In July 2013, mother phoned police to complain she could no longer care for her children D.C. (born 2010) and N.C. (born 2013).  When her initial call resulted in little action, she called again, threatening to leave her children in a hallway and stating her son D.C. was bleeding.  This was at least the seventh time since 2011 mother had asked police to step in and detain her children.  Because of the threat, the police obliged.  They also arrested mother for child endangerment.

1

The Alameda County Social Services Agency filed a dependency petition on behalf of N.C. N.C. was detained and began living with foster parents. A 2011 dependency petition on behalf of D.C. had already been filed; it eventually resulted in dismissal with D.C.'s father taking custody. Only N.C.'s status is at issue on appeal.

Mother, a single parent who has never married, struggles with mental health issues, namely anxiety and depression. She also suffers from impaired "cognitive functioning" that compromises her ability to understand the consequences of her actions, an impairment also described in agency reports as "mild mental retardation." She is easily overwhelmed by the demands of ordinary life. Psychotropic medications were recommended to her near the outset of the dependency proceeding, but she refused them. Until mother made progress addressing her mental health issues, visits with N.C. would go forward but would remain supervised at a facility called The Gathering Place.

A year after N.C.'s detention, mother gave birth to a third child, T.C., in August 2014 with a third father. In response to an unsubstantiated report of abuse or neglect of T.C., mother began receiving informal family maintenance services for T.C.

After the pregnancy, mother cancelled numerous supervised visits with N.C. at The Gathering Place facility in Pleasanton during August and September. Once because she was not feeling well, twice because she did not have diapers for T.C., and twice for a family emergency. She had visits scheduled three days a week, but she decided she no longer wished to travel to The Gathering Place on Wednesdays because it was too hard to make the trip on public transit with her infant. Ultimately, mother wanted visits closer to her home. She was also upset people in her life were not providing her with the support and respite she needed.

In October 2014, mother admitted to using, as a babysitter, a woman she recently met who she knew had previous history with Child Protective Services.

2

That same month, however, mother finally agreed to take medication: Zoloft and Buspar for her anxiety. There was a noticeable improvement in mother's ability to discuss her situation more calmly.

In October 2014 and/or November 2014, the child welfare worker offered unsupervised visits, but mother would have to transport N.C. to and from the foster parents in Dublin. Mother complained this would put all the burden on her and not burden the foster parents at all, and emphasized the difficulty of taking BART with her infant. Mother therefore declined the visits.

As an alternative, supervised visits in mother's home were arranged. These transitioned to observed visits in November 2014. While they went positively, these visits were highly structured and required a great deal of support from multiple service providers. They did not require mother to interact with all of her children at once or require mother to handle transportation issues, or other complexities of real-world parenting.

Over Thanksgiving 2014, mother called on the maternal grandmother to watch T.C. because daycare was not available. Mother planned on making the same arrangement over Christmas. The maternal grandmother was concerned mother could not parent for more than a few days at a time. Despite mother's reliance on the maternal grandmother, the relationship has been shaky, and mother sometimes cuts off contact.

In January 2015, the 18-month mark of the dependency proceedings, mother reopened the subject of unsupervised visits. Arrangements were made for mother to pick up N.C. at the Dublin BART station in the morning and return N.C. there in the afternoon. The visits would be once a week on Fridays. The first visit was set for February 13, 2015, but mother cancelled this visit because one of her sons had a "WIC appointment." Mother cancelled the visit on the February 20 because she did not have a double stroller for both N.C. and T.C., who would not be in daycare. The following

Friday was a special trip for N.C. through The Gathering Place. Thus, visits did not commence until March 6.

There was an incident on March 27 when mother felt sick and believed she could not get back on BART to return N.C. to the foster parents. Rather than make other arrangements with the foster parents directly, mother called the child welfare worker and demanded the worker solve the problem. The worker told mother the visits were supposed to be unsupervised and mother bore responsibility for resolving the situation. The worker eventually was able to arrange transportation for N.C.

While mother successfully completed other visits, the visits were becoming stressful for N.C. The visits required N.C. to endure a heavy transportation schedule, often riding in vans with semi-strangers. N.C. was self soothing with food and acting out.

On April 5, mother had an incident with T.C.'s father. He was hosting T.C. for a visit and was to return T.C. to mother at 5 p.m. at a BART station. Mother was 20 minutes early and demanded T.C.'s father come at once. He replied he would be there at 5 p.m. as scheduled, but mother took off without telling the father. She did not reunite with T.C. until the following evening. Mother had left the BART station because she was late to meet D.C.'s father. Despite her good relationship with D.C.'s father, it never occurred to her to call and explain the situation. Mother said she had no support system that could have helped her in the situation.

Mother is unemployed and depends on public funds for her income. She has also relied on a charity for half of her monthly rent. She repeatedly told child welfare workers that she was out of money and unable to buy food or diapers for her children. She would request gift cards for food, but even when granted they would be insufficient to make ends meet. Despite her obvious financial challenges, mother refused money management advice and training offered to her by the agency, including one-on-one grocery shopping assistance. She complained visits with N.C. at her home began "too soon" because she

4

did not have enough money. As the 18-month status hearing approached, she was likely going to lose her apartment and rent subsidy and had no place to go short of a shelter.

At the 18-month status hearing, the agency recommended termination of reunification services to mother. Mother and father opposed the recommendation. A day-long trial was set for and began on April 21, 2015. It continued on May 6 and May 14, and concluded May 21.

The agency's case-in-chief consisted of its reports dated January 7, 2015 and April 21, 2015, whose contents have been discussed above.

N.C. offered testimony from one of the caregivers, who corroborated N.C. protests or delays when visits with mother approach.

Mother took the stand on her own behalf. She conceded not taking medication for her mental health issues until October 31, 2014. She conceded not having enough money, at times, to buy food for her children. If N.C. were returned to mother, mother would place both N.C. and T.C. in daycare so she could cope with the daily demands of parenting. She also testified to her belief that certain third-party services related to helping her parent and budget would continue to offer her support if she were to reunify with N.C.

In rebuttal, the agency's social worker testified. Although mother clearly loved her children and had made progress with her case plan, return of N.C. would put her at substantial risk of detriment. Mother's engagement with services was too late and mother had simply reached the end of the line. There had not been a track record of safe, unsupervised visits. The supervised visits were an unrealistic measure of mother's capacity for parenting, because mother's problem was handling real-world challenges that easily overwhelm her. Meanwhile, mother had appeared to substitute dependence on police with dependence on child protective service workers. She still could not cope with emergencies and the social worker feared mother was making poor decisions about when to engage or not engage authorities, and about whom she could trust to look after N.C. in

5

times of trouble. The social worker also feared mother lacked the money management skills to keep food in the house.

In addition to the problems with visitation already discussed, the social worker testified about a missed visit that occurred on May 5, in the midst of the 18-month hearing. Transportation had been arranged to bring N.C. to mother's home, but mother was not there when N.C. arrived. Mother did not reach out to the social worker or foster parents to tell them her other child was sick and that mother had to be at a follow-up doctor's appointment. Mother claimed she left a message for a person at The Gathering Place whom she believed could stop the visit. The social worker, however, testified mother left no message for that person—there had only been a missed phone call. Mother knew the visits and transportation were difficult for N.C. and that timely cancellation was important.

The juvenile court recognized mother's efforts and her love for her children, but found return of N.C. to mother was not appropriate. Mother still had difficulty parenting over an extended period of time, maintaining a support network, budgeting, and prioritizing resources. She had not taken full advantage of the services offered to her.

Mother promptly sought writ relief and has asked this court, in the alternative, to stay the permanency planning hearing currently set for September 9, 2015.

### DISCUSSION

At an 18-month status hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (Welf. & Inst. Code, § 366.22, subd. (a).) If return is not ordered and a permanency planning hearing is set, review by writ is proper. (*Id.*, §§ 366.22, subd. (a), 366.26, subd. (*l*); *In re Suhey G.* (2013) 221 Cal.App.4th 732, 742.)

6

Mother's sole contention in this writ proceeding is that there was insufficient evidence before the juvenile court of a "substantial risk of detriment."

"A substantial risk of detriment means that 'returning a child to parental custody represents some danger to the child's physical or emotional well-being.' " (*In re E.D.* (2013) 217 Cal.App.4th 960, 965.) The juvenile court "can consider, among other things: whether changing custody will be detrimental because severing a positive loving relationship with the foster family will cause serious, long-term emotional harm [citations]; properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor [citations]; . . . instability in terms of management of a home [citation]; . . . limited awareness by a parent of the emotional and physical needs of a child [citation]; failure of a minor to have lived with the natural parent for long periods of time [citation]; and the manner in which the parent has conducted himself or herself in relation to a minor in the past." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–705.)

Completing the steps outlined in a case plan does not guarantee return of a child. (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 830.) The court "must also consider progress the parent has made towards eliminating the conditions leading to the children's placement out of home." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139–1142.)

We review a juvenile court's finding of detriment for substantial evidence. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.) "We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling." (*Ibid.*)

Viewing the evidence in favor of the agency, the juvenile court's finding of substantial detriment is supported.

The supervised visits with N.C. throughout 2013 and 2014 showed little about mother's ability to parent on her own for extended periods of time. Until early 2015, mother was first unable (as assessed by the agency) and then unwilling (due to various

asserted reasons) to pursue unsupervised visits. Thus, unsupervised visits, which occurred only weekly, did not commence until after 18 months into the dependency proceeding. Even when these visits finally began, mother had difficulties indicating she is unable to safely care for N.C. on a long-term basis. In March 2015, she could not independently cope with getting N.C. back to the foster parents when she felt sick. In April 2015, mother left a BART station without retrieving her baby T.C. when T.C.'s father declined mother's last-minute demand to come 20 minutes early for the drop off. In May 2015, in the midst of the 18-month review hearing, mother was not home for a drop off of N.C. and failed to adequately notify the relevant individuals that the visit, which involved stress for N.C., should have been cancelled.

The social worker also believed mother, though not calling the police for help, was still too heavily relying on the agency and other resources and still showing an inability to cope with emergencies and contingencies. There was simply, as the social worker testified, no track record of safe, unsupervised visits. Asking questions and seeking help alone are not problematic, and can indicate a desire to provide better care. But mother's calls for help here could be seen as suggesting an inappropriate level of dependency, not a mere lack of obtainable knowledge. (See *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789–791.)

In addition, mother had not addressed her financial situation, which was leaving her, at times, without the ability to provide food for her children. She had refused agency help in this arena. Even if she was accepting some third-party services in this regard, evidence tended to show those services were ineffective. And her housing situation remained a problematic unknown. Mother's support network is limited, her dependence on others is high, and while her anxiety may be better controlled on medication, mother apparently continues to suffer from cognitive impairment and continues to engage in irrational behavior regarding child care. Mother showed lapses in late 2014 and early 2015, times she was on medication.

8

Like the agency and trial court, we can see the progress mother has made in this case. But the problems mother faced when she summoned police to take her children in July 2013, interpreting the evidence most favorably to the agency, remain unresolved. (See *In re Mary B.*, *supra*, 218 Cal.App.4th at p. 1483 ["while Robert had exhibited positive change, it was too soon to say whether he had actually changed. As a result, there remained a substantial risk of harm to Mary should she be returned to Robert's care."].) Accordingly, substantial evidence supports the juvenile court's determination that mother has not demonstrated the ability to fully parent N.C. and her other children as a family household.

## DISPOSITION

Mother's petition for an extraordinary writ is denied on the merits. The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).) Mother's request for a stay of the section 366.26 hearing, currently scheduled for September 9, 2015, is denied as moot.

9

_____
Banke, J.

We concur:

_____
Humes, P. J.

_____
Margulies, J.

A145275, *P.C. v. The Superior Court of Alameda County*

10